MINNIE BEHNCKE, Respondent, v. MITCHELL CLAY MINING COMPANY, Appellant.

**St. Louis Court of Appeals, April 6, 1915.**

1. **MASTER AND SERVANT: Safe Place to Work: Duty of Master.** The master is liable to a servant only as he would be to a stranger, when he has performed his full duty with respect to exercising reasonable care to keep the premises at and about which the servant is required to work in a reasonably safe condition and the servant so far steps outside of the line of his duty that the relation of master and servant may be regarded as having been thereby temporarily suspended.

2. ———: ———: ———. The rule requiring the master to furnish the servant a safe place in which to work and safe premises is not restricted to the identical situs of the labor, but requires him to exercise ordinary care to see that the means of egress and ingress are ordinarily safe, and extends to all places about the premises known to the master to be used by the servant, or which might, by the exercise of ordinary care, be known by him to be so used.

3. **MINES AND MINING: Death of Servant: Safe Place to Work.** In an action for the death of an employee in a clay mine, caused by his coming in contact with a wire charged with an electric current of high voltage, while in a "cross-cut" getting a drink of water, which place was habitually and customarily used for that purpose by the employees, *held* that, although decedent was not at the precise place of his work, nevertheless the question of defendant's liability was for the jury, on the theory that the place of decedent's injury was so near the *situs* of his work and the conditions were such that a reasonably prudent employer would have known that his employees might be ex-

pected to have occasion to step into it, and would have taken precautions for their safety.

4. ———: ———: ———: Contributory Negligence. In an action for the death of an employee in a clay mine, caused by his coming in contact with a wire charged with an electric current of high voltage, while in a "cross-cut" getting a drink of water, which place was habitually and customarily used for that purpose by the employees, *held* that the evidence did not conclusively show that decedent voluntarily took hold of the wire; *held, further,* under the evidence, that the question of whether decedent was guilty of contributory negligence was for the jury.

5. EVIDENCE: Conclusiveness on Party Introducing. A party is not absolutely bound by the testimony of his witnesses, when other testimony in the case tends to contradict it.

6. TRIAL PRACTICE: Demurrer to Evidence: Rules of Decision. In passing upon a demurrer to the evidence, the court is required to make every inference of fact in favor of the party offering the evidence, which a jury might, with any degree of propriety, have inferred in his favor, and if, when received in this light, it is insufficient to support a verdict in his favor, the demurrer should be sustained; but the court is not at liberty, in passing on such demurrer, to make inferences of fact in favor of defendant, to countervail or overthrow either presumptions of law or inferences of fact in favor of plaintiff, since that would clearly be usurping the province of the jury.

7. MASTER AND SERVANT: Injury to Servant: Contributory Negligence: Burden of Proof. An employer who pleads contributory negligence as a defense to an action for injuries sustained by an employee has the burden of establishing such defense.

Appeal from St. Louis City Circuit Court.—*Hon. Leo S. Rassieur,* Judge.

AFFIRMED.

*Watts, Gentry & Lee* for appellant.

(1) The court erred in overruling the defendant's demurrer to the evidence because: (a) There was no evidence that the defendant was neglectful in the way in which it maintained any portion of its mine intended for the use of deceased or so situated that in

the line of his duty he would be exposed to danger therefrom. (b) The deceased was guilty of contributory negligence, directly causing his death. (c) A servant cannot go into a place not intended for his use, nor furnished as such by the master, and rely upon that place being kept safe by the master. The master owed him no duty to keep the wire in question insulated, for it was situated six and a half feet above the ground and in a place where deceased had no duty whatever to perform. 4 Thompson on Negligence, secs. 3749, 4677, 4679; Stagg v. Edward Westen Tea & Spice Co., 169 Mo. 489; Chamlee v. Planters Hotel Co., 155 Mo. App. 144; Lenk v. Kansas & Texas Coal Co., 80 Mo. App. 374; Duvall v. Packing Co., 119 Mo. App. 150; Leffler v. Brewing Assn., 127 Mo. App. 488; Labatt on Master & Servant (1 Ed.), sec. 633; Railway Co. v. Probst, 85 Ala. 203; Allen v. Hixson, 111 Ga. 460; Railway v. Guyson, 122 Ala. 231; Mellor v. Merchants Mfg. Co., 150 Mass. 362; Railway v. Granite Co., 70 N. H. 125; Railroad v. Adams, 105 Ind. 551; McCue v. National Starch Mfg. Co., 142 N. Y. 106; Thomson v. Babcock, 68 Mich. 523; Felch v. Allen, 98 Mass. 572; Railroad v. Chapman, 96 Ga. 769; Railroad v. Carr, 95 Ill. App. 576. (2) The court erred in giving instruction number 1 at plaintiff's request.

*Holland, Rutledge & Lashly* and *Roebke & Clay* for respondent.

(1) The lower court did not err in refusing to give a peremptory instruction at the instance of appellant. (a) The duty of the master to furnish safe premises in which to work is not confined to the identical *situs* of the labor, but extends to all places about the premises known to the master to be used, or which might by the use of ordinary care be so known to be used by the employees in connection with the serv-

189Mo.App.41

ice. Jackson v. Butler, 249 Mo. 342; Young v. Oil Co., 185 Mo. 634; Coal Mining Co. v. Robinson, 150 Ky. 707; Warren v. Mfg. Co., 173 Mo. App. 116; Birmingham Mills v. Rockhold, 143 Ala. 115; Parkinson Sugar Co. v. Riley, 50 Kan. 401; Domestic Coal Co. v. Holden, 103 N. E. 73 (Ind. 1913); Walbart v. Trexler, 156 Pa. 112; Humphreys v. Coal Co., 80 S. E. 803 (W. Va. 1914); Hays v. So. Power Co., 95 S. C. 230 (1913); 4 Labatt, Master & Servant (2 Ed.), 1558. (b) It is the master's duty to use ordinary care to furnish his servant a safe place in which to work and the servant is not charged with the duty of inspecting the place to discover lurking dangers; nor does he assume the risk of defects which are not obvious. Browning v. Kasten, 107 Mo. App. 59; Porter v. Railroad, 60 Mo. 160; Herdler v. Stave Co., 136 Mo. 3; Keegan v. Kavanaugh, 62 Mo. 230; Franklin v. Railroad, 97 Mo. App. 473; Thorpe v. Railroad, 89 Mo. 650. (c) Any person who maintains so dangerous and destructive an agent as electricity on his premises where persons may lawfully be must "use every protection accessible to insulate its wires at all places where people have a right to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be without negligence on his part contributing thereto, it is liable in damages." (d) According to all the decisions in Missouri dealing with actions for injuries resulting from contact with "live" wires in order to make a prima-facie case, it is sufficient to show that the injured person had a right to be where he was when he was injured; that he actually came in contact with the wire and received a shock; and that the defendant knew, or by the exercise of ordinary care might have known that the place at which the injury occurred was a place where it could reasonably expect its employees to be. Campbell v. Springfield Traction Co., 178 Mo. App. 520; Clark v. Railroad, 234 Mo. 396, at 418; Geismann v. Electric Co.,

Behncke v. Mitchell Clay Mining Co.

173 Mo. 654; Ryan v. St. L. Transit Co., 190 Mo. 621; Von Geba v. Gaslight Co., 209 Mo. 648; Winkleman v. Electric Light Co., 110 Mo. App. 184; Davenport v. Electric Light Co., 242 Mo. 111; Campbell v. United Rys. Co., 243 Mo. 141; Trout v. Laclede Gaslight Co., 151 Mo. App. 207; Id., 160 Mo. App. 604; Downs v. Telephone Co., 161 Mo. App. 274; Clonts v. Laclede Gaslight Co., 160 Mo. App. 456. (2) The lower court did not err in giving the main instruction asked by respondent. (a) Respondent's main instruction assumed a greater burden than was necessary under the law, as irrespective of the relation of master and servant, the law imposes the utmost degree of care upon those who use and maintain live electric wires, and permits them to be maintained only at the peril of the owner. Any one lawfully upon the premises is entitled to protection from neglect in the matter of insulation. See authorities cited under heading I-a, supra. (b) Appellant cannot complain of an instruction which does it no harm. Campbell v. Springfield Traction Co., 178 Mo. App. 520; Walters v. Denver Consol. El. Co., 17 Colo. App. 192; Winkleman v. K. C. El. Co., 110 Mo. App. 184; Geissmann v. Mo. Edison El. Co., 173 Mo. 654; Johnson v. Railroad, 150 Mo. App. 304; see also cases cited supra. (c) Even if an erroneous instruction is given, the judgment will be affirmed if it be the only one that could have been found consistent with the evidence. R. S. Mo. 1909, sec. 2082; Fitzgerald v. Barker, 96 Mo. 661; Feary v. Railroad, 162 Mo. 75, 109; Barkley v. Association, 153 Mo. 300; Peterson v. Transit Co., 199 Mo. 331, 344; McKinstry v. Transit Co., 108 Mo. App. 12. (3) Out of regard to the instinct of self-preservation the law presumes that Behncke, who is now dead, was in the exercise of ordinary care for his own safety at the time he was killed. The burden rests upon the defendant to rebut this presumption. Flynn v. Railroad, 78 Mo. 195; Buesching v. St. Louis Gaslight Co., 73 Mo. 219, 233;

Goff v. Transit Co., 199 Mo. 694, 706; Riska v. Railroad, 180 Mo. 168, 188; Weller v. Railroad, 164 Mo. 180, 199; Stotler v. Railroad, 200 Mo. 109, 146.

ALLEN, J.—This is an action brought, under section 5426, Revised Statutes 1909, by the widow of one William A. Behncke to recover damages for his death. The deceased was in the employ of defendant corporation, working in a clay mine, and it is charged that his death resulted from defendant's negligence in respect to maintaining electric wires therein. There was a verdict and judgment for plaintiff in the sum of $5000, and the case is here upon defendant's appeal.

The petition charges that defendant, in its mine in which plaintiff's husband was working as its employee, maintained a system of wires charged with electric current, of a high and dangerous voltage, and that plaintiff's husband, while engaged in the line of his duty as an employee of defendant in the said mine, came in contact with one of such wires which had been negligently allowed by defendant to become defective in insulation and dangerous, which condition was known to defendant or could have been discovered by it by the exercise of due care; by reason whereof plaintiff's husband received an electric shock resulting in his death.

The answer is a general denial, coupled with a plea of contributory negligence on the part of the deceased, wherein it is averred that he went to a portion of the mine where he had no duty to perform for defendant; and while not engaged in the performance of any duty pertaining to his employment negligently took hold of an electric wire with his hands.

The reply controverts the new matter contained in the answer.

In the mine in question fire clay was mined at a depth of about sixty feet below the surface. The mine was entered by an inclined entry extending toward the

north, which gradually sloped down to the depth at which the clay was obtained and then continued horizontally along the stratum of clay which was being mined. From this main entry other so-called entries ran east at certain intervals, parallel to each other and at right angles to the main entry, and these in turn were intersected by "crosscuts" running north and south. Plaintiff's husband was working in the first of these entries extending to the east, and not far beyond the south end of one of the crosscuts which extended north and connected this entry with the next one parallel to it. It was in this crosscut that he met his death, on August 17, 1912.

This particular crosscut had been worked out, i. e., the clay removed therefrom, and in it was installed a mine pump, operated by electric power, the current being brought in over wires strung along the entry in which plaintiff's husband was working, and extending into the crosscut to the pump which, it is said, was located at or near the center of the crosscut, i. e., approximately midway between the two entries connected by the latter. The crosscut was estimated to be about seventy feet in length; that is, this is said to have been the approximate distance between the two entries. This would put the pump about thirty-five feet from the south end of the crosscut, though there is testimony that this distance was about twenty or thirty feet. At the time of the accident a canvass curtain hung in this crosscut near the south end thereof, where it met the entry in which plaintiff's husband worked; the purpose of the curtain being to aid in controlling the circulation of the air in the mine by deflecting the air current into that portion thereof in which active operations were then being conducted. This curtain hung back in the crosscut a distance estimated by the witnesses to be ten, twelve or possibly fifteen feet from its opening into the entry where plaintiff's husband was engaged in his work. The evidence is that

the miners were accustomed to hide their tools in this crosscut back of the curtain mentioned, so that they would not be taken by men working on another "shift." It appears that cool water would collect in shallow pools in the crosscut, and it was shown that the miners were accustomed to take their water jugs, which they would fill before entering the mine, into the crosscut back of the curtain, and stand them in this water in order to keep their drinking water cool.

On the day in question plaintiff's husband ate his lunch upon the surface in company with a fellow workman. The latter testified that the deceased asked him if he was going to use his water jug in the afternoon, and that he said that he was not. Plaintiff's husband evidently took and used this jug, for it was afterward found near him in the crosscut, where he was killed. About half past three o'clock in the afternoon, two fellow workmen of the deceased, hearing the latter's cries for help issuing therefrom, ran into the crosscut behind the curtain, and found the deceased holding by both hands to an electric wire from which he was receiving a current of electricity into his body, and from which he was unable to free himself. According to the testimony he was only three or four feet from the curtain, and was in a more or less stooping position, "with his hands up," holding to the wire, the water jug being near his feet. With considerable difficulty, and after one of them had been shocked and thrown to the ground, the workmen succeeded in releasing him. He was at once taken from the mine, but died before reaching the surface.

Reference will hereinafter be made to certain further details of the evidence adduced by plaintiff, in connection with the discussion of the particular question to which it is pertinent. Defendant offered no testimony but stood upon its demurrer to the evidence interposed at the close of plaintiff's case, and assigns

here as error the action of the trial court in overruling
the same and permitting the case to go to the jury.

I. It is earnestly insisted by learned counsel for
appellant that plaintiff is not entitled to recover for
the reason that the evidence shows that her husband
was not, at the time of his death, engaged in the per-
formance of any of the duties of his employment, but
had stepped aside therefrom in going into the cross-
cut; and that the defendant owed him no duty to exer-
cise any care with respect to keeping safe the place in
which he met his death.

It is quite true that the rule is that the master is
liable to a servant only as he would be to a stranger,
when he has performed his full duty with respect to
exercising reasonable care to keep the premises at and
about which the servant is required to work in a rea-
sonably safe condition, and the servant so far steps
outside of the line of his duty that the relation of mas-
ter and servant may be regarded as having been there-
by temporarily suspended. But this rule, we think,
can have no application here. The rule requiring the
master to furnish the servant a safe place in which to
work, and safe premises, "is not restricted to the iden-
tical *situs* of the labor, but extends to the exercise by
the employer of ordinary care to see that the means of
egress and ingress are ordinarily safe, *and extends to
all places about the premises known to the master to
be used, or which might by the use of ordinary care be
so known to be used, by the employees.*" (Italics ours.)
[Jackson v. Butler, 249 Mo. 342, 155 S. W. 1071.] In
the case just cited the servant was injured while seated
upon a beam lying on an inclined platform or run-
way, in a passageway in which some repairs were then
being made, and which led from the rear of the build-
ing in which he was working, to an alley. He had
seated himself there to eat his lunch, and, having fin-
ished doing so, was in the act of throwing away the

paper in which his food had been wrapped when a nearby "locker" fell injuring him. It was held that the duty of the master with respect to furnishing safe premises extended to this portion of the building and was a duty owing to the plaintiff under the circumstances, which was not suspended during the noonday intermission, when plaintiff had not left the premises but was upon a portion thereof where he had the right to be and might be expected to be. The plaintiff was not using the passageway as a means of ingress or egress at the time, and liability was not predicated upon the duty to keep it safe as such, but upon the broader ground above stated.

It is true that the defendant employer there had knowledge that the employees were in the habit of eating lunch at such places about the premises as they might choose to go for such purpose. In the case before us it was not shown that the master had actual knowledge of the use of the crosscut just back of the curtain, by the employees for the purposes above mentioned; but the evidence is that the place was habitually and customarily so used, and from the testimony respecting this user the inference is irresistible that the master could readily have known thereof by the exercise of ordinary care to that end. And the place was so near the precise *situs* of the labor performed, and the conditions such, that a reasonably prudent man would have known that the employees, for one purpose or another, might be expected to have occasion to step into it; and would have taken precautions for their safety, especially against such a deadly agency as that which caused the death of plaintiff's husband.

The doctrine invoked would be a harsh and cruel one indeed if applicable to the facts of this case. It would mean that a master owes no duty whatsoever to his servants in a mine to keep free from the most deadly perils  places therein within a few feet of where such employees are required to work, into which they may

happen to step for proper purposes in connection with the employment, and where they are in fact accustomed to go for certain purposes. Though the crosscut in question had been worked out long before, there was nothing to warn anyone that death lurked within a few feet of this curtain, which was not intended to block off this crosscut to prevent its use, but was solely to control the circulation of the air, as was customary over the mine generally. Plaintiff's husband was but three or four feet inside of this curtain when injured, and perhaps but· thirteen or fourteen feet from the entry in which he worked; and it is clear that he went to this place to get a drink from the jug of water which was found near him. In thus getting a drink of water, necessary to his existence and to the performance of the duties of his employment as well, he can no more be held to have stepped outside of the line of his duty than could the plaintiff in Jackson v. Butler, supra, who was eating his lunch when injured.

Appellant greatly relies upon the decision of the Kansas City Court of Appeals in Lenk v. Coal Co., 80 Mo. App. 374. But the case differs materially in its facts from that before us, and is not here persuasive authority. We are amply sustained in our conclusions expressed above by the very recent decision of our Supreme Court in Jackson v. Butler, supra, and the authorities there cited, and a discussion of other cases which might be referred to in this connection is unnecessary. We have not touched upon the question of defendant's liability independent of the existence, at the time, of the relation of master and servant; but have treated the case upon the theory upon which it proceeded and was tried below.

II. But appellant insists that the evidence conclusively shows that Behncke voluntarily reached above his head and took hold of the wire; that in any event defendant owed no duty to its employees to keep this

particular portion of the wire insulated, since, as is said, no one would come in contact with it except by reaching overhead and voluntarily grasping it; and that Behncke, in thus taking hold of the wire, was guilty of contributory negligence as a matter of law.

But the fault to be found with this argument is that it rests upon inferences which the defendant is not entitled to have drawn in its favor, in support of its demurrer to the evidence.

It is said that the crosscut was about seven feet in height, and that there were crossbars running across the ceiling thereof, about six feet apart, which extended down perhaps six inches. Though the crosscut was perhaps seven or eight feet wide there was a row of props on either side thereof, the distance between these being about six feet. The exact position of the wire in question, running from the entry into the crosscut and to the pump, is not altogether clear; but it appears that it ran along the ceiling or roof of the entry, and likewise of the crosscut, until after passing the curtain mentioned, and at some point thereafter, not precisely fixed by the testimony, it began to slant downward to the pump. It ran inside of and near the props on one side of the crosscut, and is said to have been fastened to the crossbars overhead until it reached the point where it began to slant down to the pump. One witness said: "It slanted down toward the pump; slanted down from this one bar where it was tied." . . . Q. "Within what distance was that slant?" A. "About twenty or fifteen feet." Q. "The distance from the place where it was last connected to the pump would be about fifteen feet." A. "Yes, sir." This same witness was asked whether or not there was any sag in the wire in question, and he answered: "Why yes, considerably." He was then asked whether there was any sag or droop in the wire "between the points where it was fastened to the crossarms and the pump;" and he answered: "Why certainly there was a sag

in it.'' (Indicating by gesture what he meant.) Another witness testified that the wire, at the point at which Behncke was found grasping it, was parallel to the ceiling, and that this point was between two crossbars to which the wire was fastened.

In testifying as to the position in which the deceased was when found hanging to the wire, a witness, who helped to release him, said: ''Well, he wasn't exactly straight.'' His hands were up. (Illustrating.) . . . He didn't seem to be exactly straight, he seemed to be kind of stooping a little with his hands up. Q. Ahold of the wire? A. Yes, sir.''

The evidence is that there was a marked burn upon the right side of Behncke's head, about the right temple. This was attested to not only by his fellow workmen who testified in the case, but by a number of other witnesses who saw the remains; the mark being, according to the witnesses, such as might be made by a hot rod or poker.

Taking the above testimony as to the length of the slant of the wire in running down to the pump, in connection with that relative to the location of the pump with respect to the point where Behncke was found inside of the curtain, and viewing it in the light most favorable to plaintiff as it must be viewed for the purposes of the demurrer, it is evident that the jury could rightfully find that the wire was not following the ceiling at the point where Behncke came in contact with it, but had begun to slant downward toward the pump. But appellant, in effect, says that this phase of the matter may not be reckoned with because of the testimony of one witness that Behncke, when found, was grasping the wire at a point between two fastenings to the crossbars above. But plaintiff is not absolutely bound by the statement of one witness, when other testimony in the case tends to contradict it; and regardless of this, there is testimony here, without specific reference to the slanting portion of the wire, to

the effect that it sagged. The witness on whose testimony appellant relies does not say that there was no sag in the wire. He speaks of it as being parallel to the ceiling, but this was a mere statement as to its general course, which he made when asked if the wire sloped downward at this point. Though fastened to the crossbars, and pursuing a general course along the ceiling, it may nevertheless have sagged. And other evidence in the case is such as to leave little, if any, room for doubt that it either slanted or sagged low enough to come in contact with Behncke's head.

The height of the ceiling, and size of the crossbars, appear only by the estimates of the witnesses. Nor is there anything very definite as to how the wires were suspended, which, in the crosscut, are said to have been in some manner fastened beneath the crossbars by cotton "lamp-wicking." Nothing definite appears as to Behncke's height; though it does appear that he wore on his cap an ordinary miner's lamp, the entire mine being dark. The evidence respecting these matters was by no means such as to conclusively show that Behncke voluntarily reached above his head and took hold of the wire. There is absolutely no positive testimony that he did so; and the inference to be drawn from the physical facts in evidence are quite to the contrary. The fact that he received a severe burn upon the side of his head can be accounted for in no manner other than upon the theory that the wire was low enough for his head to come in contact with it, and leads to the conclusion that this occasioned his grasping of the wire. And the position in which he was found tends to refute the idea that it was necessary for him to reach above his head in order to grasp the wire. Though we are unable here to tell what the witness indicated by his illustrations on the witness stand, the testimony is to the effect that Behncke was not erect, but in a more or less stooping position, "with his hands up" grasping the wire. Though his hands

were ''up,'' how far above his head they were, if at all, does not appear. They may have been slightly above his head when he was in a stooping position, though the wire hung low enough to come in contact with his head when he was standing erect.

''In passing upon a demurrer to the evidence, the court is required to make every inference of fact in favor of the party offering the evidence, which a jury might, with any degree of propriety, have inferred in his favor, and if, when received in this light, it is insufficient to support a verdict in his favor, the demurrer should be sustained. But the court is not at liberty, in passing on such demurrer, to make inferences of fact in favor of the defendant, to countervail or overthrow either presumptions of law or inferences of fact in favor of the plaintiff; that would clearly be usurping the province of the jury.'' [See Bushing v. Gaslight Co., 73 Mo. 1. c. 231; Troll v. Drayage Co., 254 Mo. 337, 338, 162 S. W. 185.]

This phase of the case really pertains to the defense of contributory negligence pleaded, and as to which the burden is on the defendant. There is no direct evidence tending to convict Behncke of contributory negligence, but this defense rests upon inferences sought to be drawn from the facts disclosed, but which can here avail appellant nothing by way of combating the natural and legitimate inferences in favor of plaintiff which spring from the facts of the record before us.

The giving of an instruction for plaintiff is assigned as error, but this assignment is disposed of by what we have said above.

The judgment should be affirmed, and it is so ordered. *Reynolds, P. J.,* and *Nortoni, J.,* concur.